## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ROBERT PARKER**

**CIVIL ACTION**

**VERSUS**

**NO. 18-1030-JWD-EWD**

**LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL.**

## <u>RULING AND ORDER</u>

This matter comes before the Court on the *Motion to Dismiss* (Doc. 53) filed by Defendants, the State of Louisiana, through the Department of Public Safety and Corrections ("DPSC" or "DOC"); James LeBlanc, individually and in his official capacity as Secretary of DPSC; and Brenda Acklin (collectively, the "DPSC Defendants"). Plaintiff Robert Parker ("Plaintiff") opposes the motion. (Doc. 56.) DPSC Defendants have filed a reply. (Doc. 59.) Oral argument is not necessary. The Court has carefully considered the law, the facts alleged in the operative complaint, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, DPSC Defendants' motion is granted in part and denied in part.

### I.    Relevant Factual Background

#### A.    Introduction

The following facts are taken from Plaintiff's *Second Amended Complaint for Negligence, False Imprisonment, and Violation of Constitutional Rights.* (*"Second Amended Complaint"*), Doc. 52. They are assumed to be true for purposes of this motion. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).

Plaintiff in this case is Robert Parker. (*Sec. Amend. Compl.* ¶ 12, Doc. 52.) Defendants are (1) James LeBlanc ("LeBlanc"), Secretary of DPSC and "a final policymaker" sued in his individual and official capacities; (2) Ray Hanson, Warden of Richwood Correctional Center and

a "final policymaker . . . sued in his individual and official capacities"; (3) Lasalle Corrections, LLC, who at all relevant times was "Hanson's employer"; (4) Brenda Acklin ("Acklin"), who is "a DOC employee who was tasked with calculating incarceration time ensuring Mr. Parker's proper release date" and who is sued in her individual capacity; (5) "Does 1-10," who are "as-yet-unknown persons involved in the illegal imprisonment of Mr. Parker"; and (6) "ABC Insurance Agencies," who are "as-yet unknown insurance agencies" providing coverage for the Defendants for these claims. (*Id.* ¶¶ 13–19.) The instant motion is brought only by DPSC, LeBlanc, and Acklin, the "DPSC Defendants."

Plaintiff begins the operative complaint by declaring, "This is a case about Defendants' imprisonment of a man they knew should be free." (*Sec. Amend. Compl.* ¶ 1, Doc. 52.) Plaintiff then provides case law for the proposition that "jailors may not imprison inmates longer than their sentences." (*Id.* ¶ 2; *see also id.* ¶¶ 3–4.)

Plaintiff "should have been a free man on October 9, 2017. All Defendants know this because the release date was calculated months in advance according to the DOC's Time Computation & Jail Credit report and the DPS&C Corrections Services Master Record among other reports." (*Id.* ¶ 5.) But, according to the *Second Amended Complaint*, Plaintiff was held "in prison for an additional and unwarranted **337 days** until September 10, 2018, despite the preemptive and repeated entreaties of Mr. Parker and his lawyers." (*Id.* ¶ 6.) Plaintiff asserts:

> In fact, as will be discussed in detail below, the DOC's own staff admitted to the over-detention[1] of Mr. Parker is this case. What is worse, although DOC staff conceded to his then 332-day over-detention and need for immediate release, they continued to imprison Mr. Parker for an additional 5 days.

---

[1] "Over-detention" is spelled "overdetention" throughout the *Second Amended Complaint.* This Court corrects this spelling to "over-detention" throughout this ruling.

(*Id.* ¶ 7.)  "For some unknown reason, when his properly calculated release date arrived, he was not released despite his numerous attempts to correct the issue." (*Id.* ¶ 8.)  "One possible reason for the over-detention is mistakenly classifying him as a sex offender and then failing to release him even after he provided the addresses requested." (*Id.*)

Plaintiff also avers that his experience is not unique or unusual and that this is known by DOC, as evidence by a Louisiana Legislative Auditor report being released while Plaintiff was incarcerated that found that "the DOC had a serious problem of not knowing where its inmates were located, or when their proper release date was." (*Sec. Amend. Compl.* ¶ 9, Doc. 52.)  "DOC's own counsel has admitted the pattern of over-detention," and the *Second Amended Complaint* purports to quote a March 8, 2018, op-ed by Attorney General Jeff Landry on this issue. (*Id.* ¶ 10.) Plaintiff "files this lawsuit to hold the Defendants accountable and to end their practice of imprisoning men and women that should be free." (*Id.* ¶ 11.)

### B. Plaintiff's Incarceration

#### 1. Overview

On December 21, 2016, Plaintiff was arrested for possible Violation of Protective Orders and held in the Orleans Parish Prison. (*Sec. Amend. Compl.* ¶ 22, Doc. 52.) On January 4, 2017, the Orleans District Attorney refused charges. (*Id.* ¶ 24.)

"On March 27, 2017, [Plaintiff] self-revoked his Probation in Orleans Criminal District Court (Case No. 530-272 B)." (*Id.* ¶ 25.)  He was "sentenced to 2 years . . .  and was given good time credit and credit for time served that would reduce the number of days in prison." (*Id.*)

The operative complaint alleges:

On March 30, 2017, Mr. Parker was transferred from Orleans Parish Prison to DOC custody, where he spent the remainder of his incarceration between the following prisons: River Correctional Center from 3/30/17 to 4/4/17; Madison Detention

Center from 4/4/17 to 5/30/17; Richwood Correctional Center/BWP from 5/30/17 to 8/29/17; and Richwood Correctional Center from 8/29/17 to 09/10/18.

[ ] On May 4, 2017, the DOC staff member L. Cato computed a Time Computation & Jail Credit report. This report stated that Mr. Parker was Sentenced on 8/16/16; Remanded on 12/21/16; Revoked on 3/27/17 for offenses under R.S. 14:62.3 and R.S. 14:67.B(1); Sentenced to 2 years with 96 days of Jail Credit and additional Good Time Credit under Act 110; and a Must Serve date of 10/09/2017. In addition to stating that the report was "Reported by: L. Cato," handwritten notes on the document show the initials "LC" and the date of "5/4/17."

(*Id.* ¶¶ 26–27.)[2]

## 2. Misclassification as a Sex Offender

Particularly relevant here, Plaintiff alleges that, on or around September 2017, Acklin, who was the "Time Computation Specialist at David Wade Correctional Center, reviewed [Plaintiff's] Time Computation & Jail Credits." (*Sec. Amend. Compl.* ¶ 28, Doc. 52.)  "Handwritten notes on the Time Computation & Jail Credits report show the initials 'BA' and the date of '9/17.'" (*Id.*) Further, "handwritten notes on the same document also show that the RAW DS and the ADJ. DS release date of 10/09/2017 was struck out with a pen and the letters 'UNSORP' written above." (*Id.*)  The operative complaint alleges, on information and belief, that " 'UNSORP' is an acronym used in reference to residency plans for sex offenders." (*Id.*)

Plaintiff "has never been convicted of a crime for which he would be required to report to the La. Sex Offender Registry," and a search of his name in the relevant state database yields no results. (*Id.* ¶ 29.)  Nevertheless, DOC informed Plaintiff that "he was considered a sex offender and would need to provide two physical addresses of friends and/or family where he could live upon release as part of a sex offender residence plan." (*Id.*)

---

[2] The *Second Amended Complaint* also purports to attach a number of exhibits.  However, these documents are not attached to this pleading and thus will not be considered by the Court.

### 3. Attempts to Remedy the Problem

While incarcerated, Plaintiff disputed that he was a sex offender and the requirement that he create a residence plan. (*Sec. Amend. Compl.* ¶ 30, Doc. 52.)  He tried to correct the mistake by asking to discuss the issue with Warden Hanson and others at DOC. (*Id.*)  On September 4, 2017, he "submitted two Inmate Request Forms to the Richwood Correctional Center ('Richwood') where he was incarcerated" wherein he "asked to speak with Warden Hanson about . . . his release date." (*Id.* ¶ 31.)  Both requests were marked "handled" on 9/4/17 by Richwood.  (*Id.*)  Plaintiff alleges that "Warden Hanson and/or his officers, failed to transfer [Plaintiff's] ARPs to the DOC and/or failed to properly investigate and handle Mr. Parker's complaints in violation of the Administrative Remedy Procedures set for by the [DPSC] and the law." (*Id.* ¶ 32.)

"On October 9, 2017, Mr. Parker was *not* released as legally required, but instead was held an additional 337 days until his eventual release on September 10, 2018." (*Id.* ¶ 33.)  Plaintiff claims, "Instead of releasing Mr. Parker, the DPS&C Corrections Services Master Record was amended on 10/9/17 to include " 'Adjusted.: UNSORP' with additional comments that read 'INITIAL TIME COMP DOES NOT HAVE AN APPROVED SEX OFFENDER RESIDENCE PLAN.' " (*Id.* ¶ 34.)

Plaintiff disputed that he was a sex offender, but "he simultaneously attempted to provide DOC with the two addresses they requested so that he could somehow be released from his imprisonment." (*Sec. Amend. Compl.* ¶ 35, Doc. 52.)  On November 6, 2017, his 29th day of over-detention, Plaintiff tried again to contact DOC staff about his release date. (*Id.* ¶ 36.)  Plaintiff claims:

> He submitted another Inmate Request Form stating that "the reason why I didn't went home just because they say I need a new address[.] I sent Classification an address 2 times and she said she never had recive [sic] it, will you please check to

this matter for me[.] Thank you! [M]y time Overdue my,[sic] out date was 10-9-17." The request was marked as "handled" by DOC staff on 11/9/17.

(*Id.*)

On November 26, 2017, his 49th day of over-detention, Plaintiff again tried to address the issue, this time by submitting another Inmate Request Form "asking DOC staff to fax the addresses for his friends and family in the community to be included in his record." (*Id.* ¶ 37.)  Plaintiff believed this information "was essential to his being released." (*Id.*)  "The request was marked as 'handled' by DOC staff on 11/30/17." (*Id.*)

### C.  Plaintiff's Release

On August 24, 2018, the 320th day beyond his release date, Plaintiff's public defender , Aaron Zagory, contacted DOC to ask about the over-detention. (*Sec. Amend. Compl.* ¶ 38, Doc. 52.)  Zagory's email was eventually routed to Charles Romero, Supervisor of New Orleans Probation and Parole and Sex Offender Unit, who replied to Zagory's email as follows:

> "Mr. Zagory, You are not mistaken. I double checked the records, and confirmed what you said [in your email]. There was an honest mistake in the investigation, but I have corrected it. I have just notified DOC of the mistake, and that Mr. Parker can be released immediately (assuming there is nothing else holding him there). I informed DOC that Mr. Parker is NOT a sex offender. I will also notify NOPD, so they will not also make the same mistake." (emphasis of capitalization in the original).

(*Id.* ¶ 39.)

On September 7, 2018, Plaintiff's attorney William Most started to contact DOC on Plaintiff's behalf to try to end his overincarceration as quickly as possible. (*Id.* ¶ 40.)  On September 10, 2018, Most had not received a response from DOC and renewed his efforts to make contact on Plaintiff's behalf. (*Id.* ¶ 41.)  On that day, Plaintiff called Richwood and DWCC and faxed information to Sally Gryder at DOC. (*Id.*)

"After 337 days of illegal imprisonment, Mr. Parker was finally released to his friends, family and community." (*Id.* ¶ 42.)

### D. DOC's Pattern of Holding Inmates Past their Release Date.

Plaintiff alleges:

[DPSC] has a well-documented pattern of over-detention. For example, in *Chowns v. LeBlanc*, La. 37th JDC 26-932, DOC employees testified as to the consistent over-detention they observed:

a. Tracy Dibenetto, a DOC employee, testified that DOC staff have discovered approximately one case of over-detention per week for the last nine years. Ms. Dibenetto also testified that inmates are sometimes incorrectly incarcerated for periods of up to a year.

b. Henry Goines, a DOC employee whose job was to review sentence computations for the assistant secretary, testified that he typically discovered "one or two [inmates] a week" who were eligible for immediate release.

c. Cheryl Schexnayder, a DOC records analyst, testified that in the course of her job, she had looked at inmates' sentences and found that they had been done wrong and the inmate was entitled to immediate release.

d. Sonja Riddick, a DOC employee, responded to the question: "Did you ever find a time when you looked at an inmate's records and you say, this man should be out now?" with the answer: "Oh yes."

(*Sec. Amend. Compl.* ¶ 43, Doc. 52.) Plaintiff again quotes Attorney General Landry, who said that there "is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison." (*Id.* ¶ 44.) Plaintiff avers, "After finding no remedy elsewhere, [he] has initiated this action in order to recover their damages." (*Id.* ¶ 45.)

### E. Claims and Prayer for Relief

Count 1 of the *Second Amended Complaint* is for false imprisonment. (*Id.* ¶¶ 47–53.) Plaintiff claims that the authority to legally detain him ended on October 8, 2017, but he was imprisoned until September 10, 2018, despite the fact that "Defendants had possession of Time

Computation report with the release date of October 9, 2017," and despite the fact that Plaintiff "made numerous attempts at multiple levels of DOC to notify Defendants of his over-detention." (*Id.* ¶¶ 49–50.)  Indeed, Defendants should have known from an August 24, 2017, email from Plaintiff's counsel, and they conceded Plaintiff's eligibility for release in the email to counsel on September 5, 2018. (*Id.* ¶ 51.)

Count 2 is for negligence.  (*Sec. Amend. Compl.* ¶¶ 54–58, Doc. 52.)  Plaintiff claims Defendants breached their duty to avoid over-detention, and he lists various acts of negligence. (*Id.*)

Count 3 is under 42 U.S.C. § 1983 for a violation of the Due Process Clause of the Fourteenth Amendment.  (*Id.* ¶¶ 59–60.)  Plaintiff claims this clause is violated when someone remains incarcerated after the legal authority to hold him as expired and that this occurred here. (*Id.* (citations omitted).)

Count 4 is for a violation of Article One, Section Two of the Louisiana Constitution of 1974, which guarantees  that "[n]o person shall be deprived of life, liberty, or property, except by due process of law." (*Id.* ¶¶ 61–63.)  This claim parallels Count 3. (*Id.* ¶ 62.)

Count 5 is under *Monell*  and for failure to train and supervise. (*Sec. Amend. Compl.* ¶¶ 64– 67, Doc. 52.)  Plaintiff alleges that the above practices are a *de facto* policy which was allowed to happen by the policymaker's deliberate indifference. (*Id.* ¶ 65.)  Plaintiff further claims this was the moving force of constitutional violations. (*Id.* ¶ 66.)

Other claims are against the upper-level defendants.  Count 6 is also for failure to train and supervise and is made against DPSC and LaSalle. (*Id.* ¶¶ 68–70.)  Count 7 is for *respondeat superior* against LeBlanc and LaSalle. (*Id.* ¶¶ 71–72.)  Count 8 is for indemnification against

DPSC, LaSalle, LeBlanc, and Hanson. (*Id.* ¶¶ 73–75.)  Count 9 is a direct-action claim against the unknown insurers. (*Id.* ¶ 76.)

Plaintiff seeks, inter alia, declaratory relief, compensatory damages, and "[a] permanent injunction requiring Defendants to end their practice of over-detention[.]" (*Sec. Amend. Compl.* ¶ 78, Doc. 52.)

Plaintiff filed suit on October 15, 2018. (*Pet. for Negligence, False Imprisonment, and Violation of Constitutional Rights ("Pet")*, Doc. 1-3 at 1.)  On November 20, 2018, the action was removed to this Court. (Doc. 1.)

## II.    Relevant Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11, 135 S. Ct. 346, 346–47 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is

whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at \*3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).  The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

## III. Discussion

### A. Prescription of State Law Claim

#### 1. Parties' Arguments

DPSC Defendants first argue that Plaintiff's state law claims have prescribed.  Prescription begins to run on the date he was falsely imprisoned.  His release date should have been October 9, 2017, and he filed suit on October 15, 2018.  Since more than a year passed between the date of false imprisonment and when the suit being filed, Plaintiff's claim has prescribed.

Plaintiff opposes the motion.  First, Plaintiff's injury was "sustained" on November 30, 2017.   DPSC Defendants stated in their Administrative Response forms that Plaintiff's incarceration was conditioned on approval of a residency plan and the addresses he provided, and

Plaintiff did not provide those addresses until November 30, 2017. Thus, prescription began to run on that day. Further, even if prescription ran from October 9, 2017, Plaintiff's claim was suspended by *contra non valentem*, as Plaintiff's claim was "lulled into not exercising a cause of action by misrepresentations of . . . Defendants who claimed he was required to meet additional conditions before he could be released." (Doc. 56 at 5.) Plaintiff could not have reasonably known of the date his false imprisonment began because he relied on Defendants' representations. Lastly, prescription was tolled by the filing of Plaintiff's Administrative Remedy Procedure ("ARP") under Louisiana Revised Statute § 15:1172(E), which suspends the running of a claim upon the filing of an ARP until there is a final agency decision. Plaintiff's claims were suspended by at least 9 days by this law, which would make the filing of his petition timely.

DPSC Defendants respond that "Plaintiff's argument regarding the suspension of prescription during the pendency of the Administrative Remedy Procedure, if that argument is accepted as factually accurate, is sufficient to justify denying the Defendants' Motion to Dismiss *without prejudice* to raising the issue of prescription again in a Motion for Summary Judgment." (Doc. 59 at 7.) These defendants dispute, however, Plaintiff's arguments regarding the accrual date and *contra non valentem*.

### 2. Applicable Law

Under Louisiana state law, "[d]elictual actions are subject to a liberative prescription of one year." La. Civ. Code art. 3492. "This prescription commences to run from the day injury or damage is sustained." *Id.* For false imprisonment claims, "the one-year period in which Plaintiff was required to bring his state law claims began to run on the date Plaintiff was allegedly 'falsely imprisoned,' i.e. . . . []the date after Plaintiff's claimed correct release date[]." *Thomas v. Gryder*,

No. 17-1595, 2018 WL 4183206, at *5 (M.D. La. Aug. 31, 2018) (citing *Eaglin v. Eunice Police Dept.*, 2017-C-1875, 2018 WL 3154744 (La. June 27, 2018)).

However, Louisiana Revised Statute § 15:1172 provides in relevant part:

> Liberative prescription for any delictual action for injury or damages arising out of the claims asserted by a prisoner in any complaint or grievance in the administrative remedy procedure shall be suspended upon the filing of such complaint or grievance and shall continue to be suspended until the final agency decision is delivered.

La. Rev. Stat. Ann. § 15:1172(E).

"The period of suspension is not counted toward accrual of prescription. Prescription commences to run again upon the termination of the period of suspension." La. Civ. Code art. 3472.

### 3. Analysis

Plaintiff's correct release date was October 9, 2017. (*Sec. Amend. Compl. ¶* 33, Doc. 52.) Thus, he was required to file suit by October 9, 2018.  Plaintiff filed suit in state court on October 15, 2018. (*Pet.*, Doc. 1-3 at 1.)  Thus, Plaintiff's claim has prescribed by six days unless it was otherwise suspended.

Plaintiff's claim was so suspended by the filing of his ARPs.  On November 6, 2017, he purportedly submitted an Inmate Request form that was marked "handled" by DOC staff on November 9, 2017. (*Sec. Amend. Compl.* ¶ 36, Doc. 52.)  Thus, this led to three days of suspension. Further, on November 26, 2017, he filed another inmate request form that was marked "handled" by DOC staff on November 30, 2017. (*Id.* ¶ 37.)  This caused another four days of suspension. Thus, as DPSC Defendants concede, Plaintiff's state law claims have not prescribed, and DPSC Defendants' motion to dismiss on this issue is denied.

### B. Claims against DPSC and LeBlanc in his Official Capacity

#### 1. Parties' Arguments

DPSC Defendants next argue that neither DPSC nor LeBlanc, in his official capacity, can be sued for monetary relief under § 1983. Neither are "persons" under that statute. Consequently, all § 1983 claims against them must be dismissed.

Plaintiff responds that DPSC waived its Eleventh Amendment immunity by removing this suit to federal court. Additionally, Louisiana waived sovereign immunity for injuries done to persons. Thus, the state law claims must be preserved. Moreover, Plaintiff's claim for injunctive relief is not barred because it seeks prospective relief. Lastly, Secretary LeBlanc can be sued because he is also named in his individual capacity.

DPSC Defendants respond by reiterating that LeBlanc is not a "person" under § 1983. Further, "any waiver of sovereign immunity by the States is irrelevant to the issue of whether Congress created a cause of action." (Doc. 59 at 2.) Thus, Plaintiff can have no claim against these defendants. As to Plaintiff's claim for injunctive relief under § 1983, DPSC Defendants contend that this claim is moot and that Plaintiff has no standing to assert it because he is no longer in custody. Plaintiff cites Fifth Circuit case law in support of this position. Further, Plaintiff cannot obtain injunctive relief to "end the practice of over-detention" because he must first seek federal habeas corpus relief (or appropriate state relief) instead.

#### 2. Applicable Law

"Section 1983 provides a private right of action for damages to individuals who are deprived of 'any rights, privileges, or immunities' protected by the Constitution or federal law by any 'person' acting under the color of state law." *Stotter v. Univ. of Texas at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007) (quoting 42 U.S.C. § 1983). "The Supreme Court has 'held that a

State is not a 'person' against whom a § 1983 claim for money damages might be asserted.' " *Med. RX/Sys., P.L.L.C. v. Texas Dep't of State Health Servs.*, 633 F. App'x 607, 610 (5th Cir. 2016) (citing *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 617, 122 S. Ct. 1640, 1643, 152 L. Ed. 2d 806 (2002)) "This rule extends to 'arms of the state,' and to a state's 'officials acting in their official capacities.' " *Id.* (citing *Howlett v. Rose*, 496 U.S. 356, 365, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ).  Further, this rule applies even when a state waives its Eleventh Amendment immunity by voluntarily removing a suit to federal court. *See Williams v. Louisiana*, No. 17-453, 2019 WL 1003645, at *4 (M.D. La. Feb. 28, 2019) (deGravelles, J.) (finding that Plaintiff's § 1983 claims against DPSC and state officials in their official capacity were barred "as they are not considered 'persons' within the meaning of 42 U.S.C. § 1983"); *Hicks v. Dep't of Pub. Safety & Corr.*, No. 19-108, 2020 WL 428116, at *6 (M.D. La. Jan. 27, 2020) (Dick, C.J.) (finding, despite defendants' removal of the case to federal court, that "to the extent that Plaintiff asserts Section 1983 claims for monetary damages against Defendants in their official capacities, those claims are dismissed with prejudice," and quoting *Williams* at length to arrive at this conclusion).

Nevertheless, "[i]n *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity." *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). "The [*Ex Parte Young*] Court held that enforcement of an unconstitutional law is not an official act because a state can not confer authority on its officers to violate the Constitution or federal law." *Id.* (citing *American Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920–21 (5th Cir. 1993)). "To meet the *Ex Parte Young* exception, a plaintiff's suit alleging a violation of federal law must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be

declaratory or injunctive in nature and prospective in effect." *Id.* (citing *Saltz v. Tenn. Dep't of Emp't Sec.*, 976 F.2d 966, 968 (5th Cir. 1992)).

### 3. Analysis

Preliminarily, the Court must emphasize what is not at issue here. First, DPSC Defendants only sought to dismiss Plaintiff's § 1983 claims. (*See* Doc. 53-1 at 3–4 ("All §1983 claims against DPSC and Secretary LeBlanc, in his official capacity, must be dismissed with prejudice.").) Thus, contrary to Plaintiff's assertions, the Court will not address his state law claims against these defendants.

Second, DPSC Defendants raise for the first time in their reply brief the issues of standing, mootness, and federal habeas relief. (Doc. 59 at 3–4.) This is well beyond what Plaintiff raised in his opposition by invoking (without naming) *Ex Parte Young*. Because "[r]eply briefs cannot be used to raise new arguments[,]" *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) (citation omitted), the Court declines to consider these arguments. If DPSC Defendants wish to raise these issues, then they may file an additional motion at a later time so that Plaintiff has an adequate opportunity to respond. Further, as will be addressed below, Plaintiff will be given an opportunity to amend the operative complaint to cure certain deficiencies; when he does so, he should investigate whether he has a good faith basis to assert the official capacity claims in light of DPSC Defendants' arguments and remove them if he finds that he does not.

Turning to the heart of the issue, the Court finds that Plaintiff has no viable § 1983 claim for *monetary damages* against DPSC and LeBlanc in his official capacity because they are not "persons" under § 1983. *See Williams*, 2019 WL 1003645, at *4; *Hicks*, 2020 WL 428116, at *6. These claims must be dismissed.

However, Plaintiff's claim for injunctive and declaratory relief satisfies the *Ex Parte Young* exception. Plaintiff prays for "[d]eclaratory relief" and "[a] permanent injunction requiring Defendants to end their practice of over-detention[.]" (*Sec. Amend. Compl.* ¶ 78, Doc. 52.) Thus, Plaintiff alleges violations of federal law, brings the suit against a person in his official capacity, and seeks relief that is "declaratory or injunctive in nature and prospective in effect." *Aguilar*, 160 F.3d at 1054 (citation omitted). Thus, the motion to dismiss this claim is denied without prejudice, subject to any argument DPSC Defendants raise about mootness or federal habeas relief.

### C. Claims against Acklin

#### 1. Parties' Arguments

DPSC Defendants next argue that Plaintiff alleges only that "Acklin was the time computation specialist at David Wade Correctional Center who reviewed the time computation report of the Plaintiff in September of 2017." (Doc. 53-1 at 5 (citing *Sec. Amend. Compl.* ¶ 28, Doc. 52).) DPSC Defendants argue that this does not state a viable claim and that "reviewing a time computation report is not objectively unreasonable conduct in light of clearly established law." (*Id.*)

Plaintiff responds that there is a clearly established right to timely release of prisoners and that jailers have a duty to ensure that prisoners are timely released. (Doc. 56 at 11 (citation omitted).) Plaintiff distinguishes *Thomas v. Gryder*, No. 17-1595, a case from this district finding that a defendant was entitled to qualified immunity when she "rel[ied] on *correct* information from the District Attorney and the state's minute entries in making her release date calculations." (Doc. 56 at 11.) Plaintiff explains that, here, Acklin did not rely on correct information. Rather, there was no justification for holding Plaintiff past his release date. "A simple search of Mr. Parker's conviction, his sentence, or the Louisiana sex-offender registry, should have made it immediately

16

clear to Ms. Acklin that Mr. Parker should not have been held on further conditions." (*Id.* at 12.) "Even if their violation was not intentional, the Defendants' failure to conduct even the most basic investigation into the proper release date, or to exercise due care in conditioning his release, rises to the level of reckless disregard for the rights of Mr. Parker" (*Id.*)

DPSC Defendants respond, "to overcome the defense of qualified immunity, the Plaintiff must come forth with citations to cases in which the court found similar conduct violated the constitutional right of a prisoner to timely release from prison." (Doc. 59 at 6.) Plaintiff cites a single case, *Thomas*, but, there, the court founds that the defendant was entitled to qualified immunity for an over-detention as to certain claims but that there was a question of fact "regarding when Ms. Gryder knew she had recalculated Plaintiff's release date based on incorrect information." (*Id.* (quoting *Thomas v. Gryder*, No. 17-1595, 2019 WL 5790351, at *8 (M.D. La. Nov. 6, 2019).) DPSC asserts that, under *Thomas*, "the time computation officer can only be held liable for failing to order the prisoner's release after she knew his sentence computation was based on erroneous or mistaken information." (*Id.*) Here, Ms. "Acklin's alleged involvement in the Plaintiff's sentence computation occurred in September, 2017, one year before the 'honest mistake' was found and reported to DPSC; there was no alleged involvement by Ms. Acklin in the Plaintiff's sentence computation thereafter." (*Id.* at 7.) Thus, DPSC Defendants say she is entitled to qualified immunity.

### 2. Applicable Law

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L.

Ed. 2d 523 (1987) ). "In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) ). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

As to the second prong of the analysis, " '[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Kisela v. Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551, 196 L.Ed. 2d 463 (2017) (per curiam ) (alterations and internal quotation marks omitted) ). " 'Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.' " *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam) ).

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted) ). " 'In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)).

" 'Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers.' " *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552 (internal

quotation marks omitted) ). "But . . . [a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014) ). "That is a necessary part of the qualified-immunity standard[.]" *Id.*

As to the first prong of the qualified immunity analysis, "[d]etention of a prisoner for over 'thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.' " *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (quoting *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980)).  Fifth Circuit "precedent establishes that a jailer has a duty to ensure that inmates are timely released from prison." *Id.*  This circuit has also stated:

> "[w]hile not a surety for the legal correctness of a prisoner's commitment, [a jailer] is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.

*Id.* (quoting *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1969) (internal citations and footnote omitted)).

"Despite the defense of qualified immunity, '[i]f [the jailer] negligently establishes a record keeping system in which errors of this kind are likely, he will be held liable.'" *Id.* at 446 (quoting *Bryan v. Jones*, 530 F.2d 1210, 1215 (5th Cir. 1976) (en banc)). "[T]he Fifth Circuit has recognized that a jailer is 'under relatively little time pressure' and 'has the means, freedom, and the duty to make necessary inquiries.' " *Thomas v. Gryder*, No. 17-1595, 2019 WL 5790351, at *7 (M.D. La. Nov. 6, 2019) (quoting *Douthit*, 619 F.2d at 535 (quoting *Whirl*, 407 F.2d at 792, and *Bryan*, 530 F.2d at 1214)).

However, "[a] defense of official immunity is available to a jailer who has acted in reasonable good faith." *Id.* (quoting *Bryan*, 530 F.2d at 1214). Moreover, "a prison official's failure to follow prison policies or regulations does not establish a violation of a constitutional right" *Id.* (quoting *Lewis v. Sec'y of Pub. Safety and Corr.*, 870 F.3d 365, 369 (5th Cir. 2017)). "[N]egligent conduct does not implicate the due process clause." *Id.* (quoting *Salas v. Carpenter*, 980 F.2d 299, 307 (5th Cir. 1992)). Ultimately, the "determination of whether a jailer violates the Due Process Clause by unduly detaining an individual depends on 'the context of this case.' " *Id.* (quoting *Grant v. Guzman*, No. 17-2797, 2018 WL 1532960, at *12 (E.D. La. Mar. 29, 2018) (quoting *Douthit*, 619 F.2d at 532)).

Thus, for example, in *Thomas v. Gryder*, a case on which both parties now rely, plaintiff filed suit after being allegedly imprisoned 589 days past the end of his sentence. 2019 WL 5790351, at *1. Plaintiff claimed "the DOC originally calculated his release date correctly as June 5, 2015[.]" *Id.* During plaintiff's confinement, Defendant Gryder recalculated his confinement four times. *Id.* at *2. In May 2015 (the fourth occasion), she was "double checking" plaintiff's anticipated June 2015 release, and she "sought clarification after she noticed that the Bill of Information and Sentencing Order ordered Plaintiff's charges differently." *Id.* at *3. She contacted the Orleans Parish District Attorney's office about the discrepancy, spoke with an Assistant DA, and was told that plaintiff was sentenced to five years on the sexual battery conviction. *Id.* On May 7, 2015, an amended minute entry was entered on the criminal docket reflecting that he was sentenced on 1/25/13 for 5 years. *Id.* Gryder then contacted the DA's office again to confirm the five-year sentence, and, on May 11, 2015, the Assistant DA responded, " 'The updated minute entry is correct. I can send you a certified copy, if that would be helpful.' " *Id.* *Thomas* explained, "Ms. Gryder then recalculated Plaintiff's release date to be February 28, 2017. It is undisputed that

sexual battery is not subject to any good time reductions and that if Plaintiff had been sentenced to five years for sexual battery, his release date would have been February 28, 2017." *Id.*

Plaintiff then sent letters to Gryder and the Warden objecting to the new release date. *Thomas*, 2019 WL 5790351, at *3. Plaintiff eventually filed a motion for correction with the criminal court, and the court issued the July 2016 Order correcting the problem. *Id.* Gryder testified that she did not receive the order until litigation, but Plaintiff submitted a declaration saying he sent the order to her on August 17, 2016. *Id.* Plaintiff sent Brenda Acklin a copy of the letter and sentencing transcript on December 5, 2016, and Gryder stated that she realized that Plaintiff should have been released in "early December, 2016." *Id.* After receiving the transcript, Gryder sent an email to the Assistant DA asking for an updated minute entry and processed Plaintiff for release in January 2017. *Id.* at *4. Plaintiff was eventually released on January 13, 2017. *Id.*

The magistrate judge found that, "[b]ecause it was not objectively unreasonable for Ms. Gryder to seek clarification in the first place, it was not objectively unreasonable for Ms. Gryder to rely on that clarification once received." *Id.* at *7. The court further explained:

> where the amended minute entry and confirmation from the DA occurred in response to Ms. Gryder's request for clarification, it would be especially inconsistent to require that Ms. Gryder continue to rely on the earlier Sentencing Order, and the Court finds that constitutional minima are met where Ms. Gryder sought to be *more* conscientious rather than less with respect to her calculation of Plaintiff's release date.

*Id.* However, the magistrate judge found that there was a question of fact concerning the date on which Gryder "knew that this fourth recalculation was based on inaccurate information." *Id.* at *8. Gryder said she did not know about the July 2016 order until litigation began, but Plaintiff submitted evidence that she sent the order to her on August 17, 2016. *Id.* "Plaintiff was not

released until almost five months after he allegedly provided Ms. Gryder with official, corrected

information." *Id.* The magistrate judge concluded:

> While the question here is not as clear cut as that set out in *Whirl* [(where an almost nine-
> month delay was found to be unreasonable)], based on the timeline of "clarifications" from
> the criminal court and the Assistant DA, Plaintiff has raised a material issue of fact
> regarding when Ms. Gryder knew she had recalculated Plaintiff's release date based on
> incorrect information. Accordingly, while the Court finds that Ms. Gryder is entitled to
> qualified immunity for Plaintiff's over-detention from June 5, 2015 through August 17,
> 2016 and therefore summary judgment dismissing Plaintiff's claims against Ms. Gryder for
> that period of time is appropriate, a genuine issue of material fact precludes summary
> judgment in favor of Ms. Gryder for the time period of August 18, 2016 through January
> 13, 2017.

*Id.*

### 3. Analysis

The Court finds that Plaintiff has stated a viable claim against Acklin. Again, Plaintiff

alleges that Acklin is "a DOC employee who was tasked with calculating incarceration time

ensuring Mr. Parker's proper release date." (*Sec. Amend. Compl.* ¶ 17, Doc. 52.)  Plaintiff further

alleges that, "All Defendants [knew his correct release date] because the release date was

calculated months in advance according to the DOC's Time Computation & Jail Credit report and

the DPS&C Corrections Services Master Record among other reports." (*Id.* ¶ 5.)  On or around

September 2017, Acklin, the "Time Computation Specialist at David Wade Correctional Center,

reviewed [Plaintiff's] Time Computation & Jail Credits." (*Id.* ¶ 28.)  "Handwritten notes on the

Time Computation & Jail Credits report show the initials 'BA' and the date of '9/17.'" (*Id.*)

Further, "handwritten notes on the same document also show that the RAW DS and the ADJ. DS

release date of 10/09/2017 was struck out with a pen and the letters 'UNSORP' written above."

(*Id.*)  The operative complaint alleges, on information and belief, that " 'UNSORP' is an acronym

used in reference to residency plans for sex offenders." (*Id.*)  According to the *Second Amended

Complaint,* Plaintiff "has never been convicted of a crime for which he would be required to report

to the La. Sex Offender Registry," and a search of his name in the relevant state database yields no results. (*Id.* ¶ 29.)  Nevertheless, DOC informed Plaintiff that "he was considered a sex offender and would need to provide two physical addresses of friends and/or family where he could live upon release as part of a sex offender residence plan." (*Id.*)  This error directly led to his over-detention.

Assuming these allegations to be true, a jury could reasonably conclude that Acklin had the correct information in Plaintiff's reports that he had never been convicted of a crime for which he had to register as a sex offender but that, despite this, Acklin made the notation in his file requiring him to have a residency plan as a sex offender.  This is critical because, in *Thomas*, the Court found that the defendant was not entitled to qualified immunity for those days for which she allegedly had correct information about the plaintiff's release date. *Thomas*, 2019 WL 5790351, at *7–8.  By the same reasoning, Acklin is not entitled to qualified immunity here.

Further, unlike *Thomas*, this is not an instance where Acklin was "more conscientious" about calculating Plaintiff's release date than would otherwise be required.  Indeed, *Thomas* states that, according to the Fifth Circuit, "a jailer is 'under relatively little time pressure' and 'has the means, freedom, and the duty to make necessary inquiries.' " *Id.* at *7 (quotation omitted).  This is critical because Plaintiff specifically alleges that a search of the relevant database would demonstrate that Plaintiff was not a sex offender, and a reasonable juror could conclude that, by failing to verify this information, Acklin breached her "duty to make necessary inquiries." *Id.*

It must be emphasized that the question is not whether Plaintiff will prevail at trial against Acklin.  The only question at this stage is whether the *Second Amended Complaint* contains enough factual matter (taken as true) to raise a reasonable hope or expectation that discovery will reveal relevant evidence of each element of a claim. *Lormand*, 565 F.3d at 257.  Plaintiff has met that

burden at this stage.  As alleged, Acklin's conduct was objectively unreasonable under clearly established law, so DPSC Defendant's motion must be denied.

### D.  Claims against LeBlanc in his Individual Capacity

#### 1. Parties' Arguments

DPSC Defendants next assert that LeBlanc is entitled to qualified immunity.  These defendants argue that the only allegation against LeBlanc is that he is "liable as [a] principal for all torts committed by [his] agents." (Doc. 53-1 at 5.)  But vicarious liability is inapplicable to § 1983, so Plaintiff's claim against LeBlanc must be dismissed.

Plaintiff responds that LeBlanc can be liable for implementing unconstitutional policies and for failing to train or supervise if he acted with deliberate indifference.  Plaintiff claims that he alleges a pattern of over-detention at DPSC under LeBlanc's direction and that LeBlanc knew about this over-detention but acted with deliberate indifference.  Further, this pattern is objectively unreasonable under clearly established law, as prison officials must ensure the timely release of inmates.

DPSC Defendants respond that Plaintiff lumps all defendants together but does not make specific allegations against LeBlanc.  These defendants argue that none of the factual allegations relied on by Plaintiff in his opposition are made in the operative complaint, and Plaintiff provides no citations to any of these arguments.

#### 2. Applicable Law - Supervisor Liability

As to the constitutional violation prong, "[u]nder section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Simon v. LeBlanc*, 694 F. App'x 260, 261 (5th Cir. 2017) (per curiam) (quoting *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) ). " 'A supervisory official may be held liable . . . only if (1) he affirmatively

participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury.' " *Porter*, 659 F.3d at 446 (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) ). "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.* (quoting *Gates*, 537 F.3d at 435 (internal quotation marks and citation omitted, alterations and emphasis in *Gates* )).

"A pattern is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.' " *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.' " *Id.* (quoting *Webster,* 735 F.2d at 842). "It is thus clear that a plaintiff must demonstrate 'a pattern of abuses that transcends the error made in a single case.' " *Id.* at 850–51 (quoting *Piotrowski*, 237 F.3d at 582 (citations omitted)). "A pattern requires similarity and specificity; '[p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question.' " *Id.* at 851 (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 383 (5th Cir. 2005)).

" '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Estate of Davis*, 406 F.3d at 381 (quoting *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410, 117 S. Ct.

1382, 137 L. Ed. 2d 626 (1997) ). " 'For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)). "Deliberate indifference requires a showing of more than negligence or even gross negligence." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc) ). " 'Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity.' " *Id.* (quoting *Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)).

Additionally, "[a] failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Porter*, 659 F.3d at 446 (quoting *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)). Nevertheless, "[l]iability for failure to promulgate policy . . . require[s] that the defendant . . . acted with deliberate indifference." *Id.* As the Fifth Circuit stated with respect to "failure-to-train" claims (and, by "logical" analogy, failure-to-promulgate claims):

> To establish that a state actor disregarded a known or obvious consequence of his actions, there must be actual or constructive notice that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program. A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference, because without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. Without cabining failure-to-train claims in this manner (or, logically, failure-to-promulgate-policy claims), a standard less stringent than deliberate indifference would be employed, and a failure-to-train claim would result in *de facto respondeat* superior liability.

*Id.* at 447 (citations, alterations, and quotations omitted).

### 3. Analysis

The Court finds that Plaintiff has failed to state a viable claim of supervisor liability against LeBlanc. Again, " '[a] supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury.' " *Porter*, 659 F.3d at 446. Plaintiff must typically allege a pattern of violations. *Id.* at 447. "A pattern requires similarity and specificity; '[p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question.' " *Peterson*, 588 F.3d at 851 (quoting *Estate of Davis,* 406 F.3d at 383).

Here, Plaintiff fails to satisfy that standard. Again, Plaintiff alleges:

[DPSC] has a well-documented pattern of over-detention. For example, in *Chowns v. LeBlanc*, La. 37th JDC 26-932, DOC employees testified as to the consistent over-detention they observed:

a. Tracy Dibenetto, a DOC employee, testified that DOC staff have discovered approximately <u>one case of over-detention per week for the last nine years</u>. Ms. Dibenetto also testified that inmates are sometimes incorrectly incarcerated for periods of up to a year.

b. Henry Goines, a DOC employee whose job was to review sentence computations for the assistant secretary, testified that he typically discovered "one or two [inmates] a week" who were eligible for immediate release.

c. Cheryl Schexnayder, a DOC records analyst, testified that in the course of her job, she had looked at inmates' sentences and found that they had been done wrong and the inmate was entitled to immediate release.

d. Sonja Riddick, a DOC employee, responded to the question: "Did you ever find a time when you looked at an inmate's records and you say, this man should be out now?" with the answer: "<u>Oh yes</u>."

(*Sec. Amend. Compl.* ¶ 43, Doc. 52.) Plaintiff also quotes Attorney General Landry, who said that there "is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison." (*Id.*

¶ 44.)  Lastly, Plaintiff refers to the Louisiana Legislative Auditor report being released while Plaintiff was incarcerated that found that "the DOC had a serious problem of not knowing where its inmates were located, or when their proper release date was." (*Id.* ¶ 9.)

While these allegations are serious and reflect numerous instances of misconduct, Plaintiff fails to provide the necessary "similarity and specificity" required by the Fifth Circuit; there is no indication from the *Second Amended Complaint* that the above problems detailed above are similar to the ones faced by Plaintiff.

*Thomas v. Gryde* is analogous on this issue as well.  Again, Plaintiff filed suit after being allegedly imprisoned 589 days past the end of his sentence. *Thomas*, 2019 WL 5790351 at *1. Plaintiff brought a supervisory liability claim against LeBlanc and the warden claiming that they implemented unconstitutional policies. *Id.* at *9.  Plaintiff argued that " 'the DOC has investigated and admitted that it has been over-detaining <u>hundreds of inmates per month</u>, more than sufficient to hold LeBlanc and Goodwin liable under *Monell/Hinojosa*.' " *Id.*  at *10.  To support his position, Plaintiff pointed to, *inter alia*, "a 2012 study conducted by Louisiana DOC staff . . .  wherein, per Plaintiff, it was 'found that as of January 2012, the DOC had a "1446 backlog of cases to have time computed," resulting in an average processing delay of 110 days.' " *Id.*  Plaintiff also referred to an audit of the DOC and the Attorney General's op-ed. *Id.*

Despite this evidence, the Court granted summary judgment on this claim, explaining that "Plaintiff's over-detention does not involve such concerns." *Id.*  The Court stated:

> [Unlike the evidence submitted by Plaintiff,] this is not a case involving a delay in Plaintiff's sentence calculation, or an error in that calculation. Instead, Plaintiff complains that in calculating his release date, Ms. Gryder improperly relied on information that was wrong. Because Plaintiff has presented no evidence to support a finding that Warden Goodwin or Secretary LeBlanc were deliberately indifferent based on a pattern of sufficiently similar incidents, Defendants are entitled to summary judgment dismissing [Plaintiff's claim].

*Id.*

Similar reasoning applies here.  The *Second Amended Complaint* lacks adequate detail from which the Court can plausibly conclude that the other described incidents are sufficiently similar to what befell Plaintiff or that the same or sufficiently underlying cause is to blame.  Indeed, Plaintiff provides no detail about these other incidents and essentially says only that over-detention is ubiquitous.  Without more, Plaintiff's claim must fail.

Plaintiff's claim also fails for an additional reason.  Again, " '[i]n order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates.' " *Porter*, 659 F.3d at 446.  Deliberate indifference requires more than negligence or even gross negligence. *Estate of Davis*, 406 F.3d at 381.  LeBlanc " must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The Court finds that Plaintiff has, at this point, failed to adequately allege deliberate indifference.  Plaintiff points to a state court law suit where DPSC employees testified about the deficiencies, but he fails to link this suit and this pattern to LeBlanc in such a way to establish that LeBlanc actually drew the inference that there was a substantial risk of harm to Plaintiff and other inmates.  Further, Plaintiff alleges that Attorney General Landry was aware of the problem and that there was a Louisiana Audit report documenting it, but he fails to allege, even on information and belief, that LeBlanc was aware of what Landry said in the op-ed or of what was contained in the audit.  Without more, Plaintiff is effectively arguing for respondeat superior liability, which is improper under § 1983.

However, for reasons given more extensively below, the Court believes that there is a reasonable probability that Plaintiff can cure the deficiencies in the *Second Amended Complaint* by explaining the similarity of other incidents to Plaintiff's case and by establishing LeBlanc's knowledge and the basis thereof.  Accordingly, Plaintiff will be given leave to amend the complaint to cure the above problems.[3]

### E.  Leave to Amend

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955).  The Fifth Circuit has further stated: "In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

Relying on *Great Plains* and other cases from this circuit, one district court in Texas articulated the standard as follows:

> When a complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the action before dismissing the action with prejudice unless it is clear that the defects in the complaint are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir. 2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.,* 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion.")

---

[3] The Court notes that, while Plaintiff is not entitled to discovery on the individual capacity claim because he failed to allege sufficient facts to overcome qualified immunity, *see Zapata v. Melson*, 750 F.3d 481, 484–85 (5th Cir. 2014), that bar does not apply to Plaintiff's official capacity claim, which in this case informs the individual capacity claim against LeBlanc.  Plaintiff appears able to obtain discovery on this issue, within the parameters established by the Magistrate Judge.

(internal citation omitted). However, a court may deny leave to amend a complaint
if the court determines that "the proposed change clearly is frivolous or advances a
claim or defense that is legally insufficient on its face." 6 Charles A. Wright, Arthur
R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed.1990)
(footnote omitted); *see also Martin's Herend Imports, Inc. v. Diamond & Gem
Trading United States of Am. Co.,* 195 F.3d 765, 771 (5th Cir. 1999) ("A district
court acts within its discretion when dismissing a motion to amend that is frivolous
or futile.") (footnote omitted).

*Tow v. Amegy Bank N.A.*, 498 B.R. 757, 765 (S.D. Tex. 2013).

Finally, one leading treatise explained:

As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is
not immediately final or on the merits because the district court normally will give
the plaintiff leave to file an amended complaint to see if the shortcomings of the
original document can be corrected. The federal rule policy of deciding cases on
the basis of the substantive rights involved rather than on technicalities requires that
the plaintiff be given every opportunity to cure a formal defect in the pleading. This
is true even when the district judge doubts that the plaintiff will be able to overcome
the shortcomings in the initial pleading. Thus, the cases make it clear that leave to
amend the complaint should be refused only if it appears to a certainty that the
plaintiff cannot state a claim. A district court's refusal to allow leave to amend is
reviewed for abuse of discretion by the court of appeals. A wise judicial practice
(and one that is commonly followed) would be to allow at least one amendment
regardless of how unpromising the initial pleading appears because except in
unusual circumstances it is unlikely that the district court will be able to determine
conclusively on the face of a defective pleading whether the plaintiff actually can
state a claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

As stated above, the Court believes there is a reasonable probability that the Plaintiff could

cure the deficiencies in the *Second Amended Complaint* through an amendment.  Further, "[w]hile

Plaintiff previously amended [his] complaint, [he] did not do so in response to a ruling by this

Court assessing the sufficiency of Plaintiff's claims. Thus, . . . the Court will act in accordance

with the 'wise judicial practice' and general rule and grant Plaintiff[]" leave to amend. *JMCB, LLC

v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. 2018).

IV.     **Conclusion**

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss* (Doc. 53) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted in that the following claims are **DISMISSED WITHOUT PREJUDICE**: (1) Plaintiff's § 1983 claim for monetary damages against LeBlanc in his official capacity, and (2) Plaintiff's § 1983 claims against LeBlanc in his individual capacity. In all other respects, the motion is **DENIED**.  Plaintiff shall be given twenty-eight (28) in which to cure the operative complaint of these deficiencies.  Failure to do so will result in the dismissal of these claims with prejudice.

Signed in Baton Rouge, Louisiana, on <u>July 29, 2020</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**